## FLOWERS et al. v. TEXAS MEXICAN RY. CO. et al.

### No. 9380.

Court of Civil Appeals of Texas. Austin.

July 28, 1943.

Gerald C. Mann, Atty. Gen., and George P. Blackburn, Harold McCracken, R. Dean Moorhead, and Fowler Roberts, Asst. Attys. Gen., for appellants.

Andrews, Kelley, Kurth & Campbell, of Houston, J. D. Dodson, of San Antonio, and Black, Graves & Stayton, of Austin (by J. W. Stayton, of Austin), for appellees.

McCLENDON, Chief Justice.

Suit brought under Art. 7057b, Vernon's Ann.Civ.St., by two railroad corporations— Tex-Mex (Texas Mexican Railway Company) and Southern (San Antonio Southern Railway Company)—against certain state officials (Secretary of State, Attorney General, Treasurer and Comptroller), to recover corporation franchise taxes for the year 1939 demanded by the Secretary of State under Art. 7084, Vernon's Ann. Civ.St., as amended by 1930 Laws, 5th Called Sess., p. 220, Ch. 68, § 2, and paid under protest. The amount sued for is that arrived at by computation under Sec. (D) less that so arrived at under Sec. (B) of Art. 7084; the railroads, on the one hand, contending that they are "corporations which are now (1930) required to pay annually a tax upon intangible assets," and therefore Sec. (B) applies; and the defendant officials, on the other hand, contending that they are not such corporations, since they were not assessed and did not pay any intangible assets tax for the year 1939, and therefore Sec. (D) applies. In a trial to the court the railroads recovered the amount sued for. The officials have appealed.

The facts are not in dispute. The proper interpretation of the pertinent sections of Art. 7084 is the sole question the appeal presents. These sections (substantially stated, except where quoted) follow:

(A) prescribed a graduated tax upon all corporations, domestic and foreign (with stated exceptions) based upon the amount of their capital stock.

"(B) Corporations which are now required by law to pay annually a tax upon intangible assets, corporations owning or operating street railways in or upon the public streets of any town or city, and corporations organized to maintain or owning or operating electric interurban railways, shall be required to hereafter pay a franchise tax equal to one-fifth (1/5) of the franchise tax herein imposed against all other corporations under Section (A) herein."

(C) exempted certain terminal companies not here involved.

"(D) Except as provided in preceding Clauses (B) and (C) all public utility corporations, which shall include every such corporation engaged solely in the business of a public utility whose rates or service is regulated, or subject to regulation in whole or in part, by law, shall pay a franchise tax as provided in this Act, except the same shall be based on that proportion of the issued and outstanding capital stock, surplus, and undivided profits, which the gross receipts of the business of said corporation done in this State bears to its total gross receipts, instead of the gross assets; and in lieu of the rate hereinbefore prescribed said tax shall be computed as follows:" (Here follow rates in some respects less than those in Sec. A.)

The respective contentions of the parties may be thus summarized:

Those of the railroads: Sec. B designates three classes of corporations falling within its purview: (1) Those (now—1930) required by law to pay annually a tax on intangible assets; (2) certain street railway corporations; and (3) electric interurban railway corporations. The only statutory provision then requiring the assessment and payment of taxes on intangible assets, as such, was the Act of 1905, c. 146, p. 351 (as amended by Acts 1907, 1st C.S., c. 17, p. 469), present Art. 7105, R.C.S., known as the Intangible Assets Act, which expressly included railroad corporations. The word "now" relates to 1930, the effective date of the Act (this is conceded), and therefore alludes to the classes of corporations which were then "required by law" to pay such tax "annually." This embraces all corporations then enumerated in Art.

7105, whether or not such taxes were actually assessed and paid. This for two reasons: First, because that is the natural and obvious meaning of the language of the statute. It is to be noted, in this connection, that to apply it only to corporations against which such taxes were then assessed would exclude corporations not then assessed, but assessed in subsequent years, and would also exclude corporations of the classes named which were not then in existence but were thereafter chartered. Second, because such interpretation would render the statute unenforceable, for the reason that the franchise tax is required to be paid on or before May 1st of each year, and under the intangible tax act that assessment could not be made until some time after May 31st of each year. It could not therefore be known on May 1st, the date of required payment of the franchise tax, whether any intangible tax would be assessed for that year against the corporation required to pay the franchise tax.

Those of the officials (appellants): The intangible tax act does not levy any tax, but merely prescribes a method of assessing such tax against those named therein. So held in Missouri, K. & T. R. Co. v. Shannon, 100 Tex. 379, 100 S.W. 138, 10 L.R.A.,N.S., 681. Therefore it does not require the payment of such tax. Intangible assets are property, and all corporations are "required by law to pay" taxes thereon, if they own such property. However, to construe Sec. B as applying to all corporations whether or not they in fact pay the tax, would nullify Sec. A, as all corporations would thereby be included in Sec. B. Therefore the section must be construed to include only such corporations as actually pay the tax. Two alternative constructions of Sec. B are urged, each of which leads to the same result, so far as concerns this case. First, it is contended that Sec. B only names two classes of corporations, (1) street railways and (2) electric interurban railways, which actually pay taxes on intangible assets; the phrase, "corporations which are now required by law to pay annually a tax upon intangible assets," being a modifying clause to the two named classes of corporations. Second, in the alternative, conceding that Sec. B designates three classes of corporations, and that the first class includes only those named in the intangible tax act, only such corporations actually paying that tax are

included. This because there would be no basis for extending the exemption of 4/5 of the tax prescribed in Sec. A to corporations that did not in fact pay any intangible assets tax; therefore the language "required to pay" must be construed to mean paying.

Conceding that the intangible tax act did not levy a tax upon the named corporations, but only provided a mode of assessment of their intangibles, nevertheless we think it clear that Sec. B referred (in above class 1) to those corporations alone. It is not necessary to review in detail the background of that act. It was passed for the manifest purpose of reaching assets of those named therein (principally railroads) which, it was considered, were escaping their just burden of taxation. The tax collector of Travis County assessed as unrendered personal property for the year 1897 the intangible assets of the Austin & Northwestern R. R. Co. domiciled in that county. Recovery by the State upon that assessment was denied by the district court, this court (State v. Austin & N. W. R. Co., 60 S.W. 886), and the Supreme Court, 94 Tex. 530, 62 S.W. 1050. The ground upon which this court denied recovery (Justice Key dissenting) was that the situs of the intangibles (if in fact assessable separately from the physical property) was not entirely in the county of the railroad's domicile, but was in the several counties in which its physical properties were located. This holding was expressly approved by the Supreme Court in refusing a writ of error upon this and several other grounds. There was not then any specific method prescribed for assessing intangibles; and, as stated by the Supreme Court in the Shannon case [100 Tex. 379, 100 S.W. 142, 10 L.R.A.,N.S., 681]: "We recognized then (in the Austin & N. W. case), that the methods of assessing the intangible values of a railroad company provided by the laws then in force was extremely crude and poorly calculated to accomplish the proposed object. In the present law the Legislature has attempted to correct this, and to provide a mode by which the intangible values of the line or lines of a railroad company in operation may be assessed as a part of the whole property of a railroad company and apportioned to the respective counties through which such line or lines are located." The court also said: " * * * if in the case of State v. Austin & N. W. R.

Co., supra, we were mistaken in holding (though we do not wish to intimate that we were so mistaken) that under the law as it then was, it was the duty of the county assessors to consider the property of the railroad company lying in their respective counties as an operating going concern, and that in assessing its value not to confine themselves to the value of the physical properties disassociated from the whole, the section just quoted (Sec. 17 of Art. VIII, Texas Constitution, which authorizes the Legislature to 'require other subjects or objects to be taxed') affords ample authority to the Legislature to tax such intangible assets as a subject or object of taxation omitted from those specified in the previous sections of the article."

Theoretically, perhaps, "intangible assets" may be regarded as a species of property separate and apart from tangible or physical property. See 42 Am.Jur., p. 194, § 11. A discussion of this subject would serve no useful purpose here.

For all practical purposes there was in 1930 no law (statutory or otherwise) requiring the payment of taxes upon intangibles as such; nor is there now such law other than the intangible tax act. That act expressly provides that each incorporated railroad (and others therein named) "shall pay an annual tax to the State," etc. The Legislature passing the original act (Laws 1905, c. 146) evidently considered it was actually levying a tax, as well as providing for its assessment and collection. This appears from the caption: "An Act for the taxation of the intangible assets of certain corporations," etc. But conceding that the effect of the act was not to levy the tax, still the above language "shall pay" unequivocally "requires" its payment, and the act provided the machinery to that end. It is not without significance that in Sec. B the Legislature followed literally the wording of Art. 7105 in the language "required by law to pay annually a tax upon intangible assets."

It further conclusively appears that corporations other than those mentioned in the act, and actually paying tax on intangibles (if any there be), were not intended to be included in Sec. B from the fact that there would be no practical means of ascertaining whether such tax was in fact paid. There was no law requiring the separate assessment of such tax, and there was no means of ascertaining whether such

tax was in fact included in the assessment of physical assets. Every corporation paying taxes upon physical assets could claim that it was thereby paying upon intangibles, and there would be no reasonable means of refuting that claim.

We find no merit in appellants' contention that Sec. B names only two classes of corporations as its subjects, and that those classes are modified by the first clause of the section. Tested by the plain and unequivocal meaning of the language and grammatical structure of the section, it does not admit of that construction. Furthermore, the first clause, if only a modifying one, would have to be construed as limiting the two classes to those actually paying the tax, otherwise the clause would be meaningless. And to give it that meaning would entail the same practical enforcement difficulties already adverted to.

When read in the light of surrounding facts and circumstances as related to the subject dealt with, we think the only reasonable construction of the first clause of Sec. B is that it related to railroads and other corporations expressly mentioned in Art. 7105, whether or not they actually paid taxes upon their intangibles.

With reference to appellants' contention that there would be no basis for relieving railroads (and other named corporations) from the payment of 4/5 of the franchise tax prescribed in Sec. A, if in fact they did not actually pay a franchise tax, the following should be noted in addition to the fact that whether there would be any intangible tax could not be known at the time the franchise tax was due (May 1st). The evident purpose of Sec. B was to relieve those corporations as a class that were required to render for taxation all of their property both tangible and intangible. This was not made dependent upon the amount of such intangibles, relatively or otherwise. A railroad might own physical property that was actually taxed at values of many millions and yet its intangibles (for a given year) might be assessed at only a few hundred, and the tax thereon be negligible, or at least relatively so. However, such railroad would fall within Sec. B the same as one that paid a relatively great intangible tax. The theory of the 4/5 exemption clearly is that corporations whose intangibles are required to be assessed under the act are paying more nearly upon a full rendition basis than those not within the

act; and this whether or not in any one year the total value of their assets exceeds the assessed value of their physical properties.

If the clause were in any way ambiguous in this regard (which we hold is not the case), then such ambiguity should be resolved in favor of the construction we give the section, because of a uniform departmental construction from the time of the passage of Sec. B (1930) to 1939, when the Secretary of State first demanded payment under Sec. D. This was a revenue measure and, as stated in Franklin F. I. Co. v. Hall, 112 Tex. 332, 247 S.W. 822, 823: "The acquiescence of the Legislature in the departmental construction has not been merely a passive one, for the reason that the fees authorized by the act are a source of revenue, the consideration of which is one of the primary duties of the Legislature."

This holding has been uniformly followed. See Clark v. Atlantic Pipe Line Co., Tex.Civ.App., 134 S.W.2d 322, 328, error refused, from which we quote: "Conceding, arguendo, that the language of the act is susceptible of the construction that it embraces inter as well as intrastate business, it manifestly is not so clearly so as not to render it open to construction. Departmental construction may therefore become a determining factor. Especially is this true regarding revenue measures, the administration of which is under constant observation of the legislature."

This departmental construction was actually called to the attention of the Legislature in the report of the State Tax Board covering the years 1933 and 1934. That report states that in considering the attitude of the railroads to the intangible tax law the effect of Sec. B of Art. 7084 "should not be overlooked." "By this statute," the report reads, "the Legislature has removed to a considerable extent the 'sting' of the Intangible Assets Tax Law by giving the railroads a reduction of four-fifths on the franchise taxes they would be required to pay, but for the Intangible Assets Tax Law." The report lists (for 1934) the railroads actually paying the intangible tax and shows the amount of franchise tax they actually paid under Sec. B and the amount they would be required to pay if Sec. B were repealed. It also shows the following: "Railroads (81

which did not pay an intangible tax) Tax due under Article 7084–B, $10,084.24. Tax due if Article 7084–B were repealed, $49,781.20."

Appellants' remaining point assigns error upon the holding of the trial court that the protests of the railroads were sufficient to sustain the action under the provisions of Art. 7057b.

These protests were in the form of letters addressed to the Secretary of State. That of the Tex-Mex reads:

"Receipt as acknowledged of your demand that the Texas Mexican Railway Company pay, on or before May 1st, 1940, $974.60 as franchise tax for 1940 under Article 7084(d), Revised Statutes.

"This corporation is one subject to the law requiring payment annually of a tax upon intangible assets. Each year since enactment of Article 7084(b) and (d) the authorized taxing authorities have demanded, and this corporation has paid, its franchise tax under the provisions of Article 7084(b). The Legislature has impliedly approved that interpretation as expressing the legislative intent. This company respectfully insists that such interpretation with respect to Articles 7105 and 7084(b) has been correct and should be adhered to. The return for 1940 heretofore made, and the tax of $350.40 in accordance therewith was paid in keeping with said interpretation heretofore uniformly placed upon said articles.

"However, in response to your demand that the difference between the amount, if any, heretofore paid and $974.60 be now paid, draft for the difference between the $350.40 which has been paid, and $974.60 demanded, to-wit, $624.20, is herewith enclosed. Said additional payment is made under protest upon the grounds that for the reasons aforesaid the return heretofore made and the tax heretofore paid of $350.40 under the provision of Article 7084(b), Revised Statutes, is the lawful franchise tax assessable against and collectible from The Texas Mexican Railway Company for the year 1940. This protest accompanies said payment in order to preserve the rights of this corporation to file suit for recovery of the excess demanded and now paid over what the payment should be under Article 7084(b), and as provided by Article 5057(b), [7057b] Section 2, Revised Statutes."

That of the Southern: "* * * was on the grounds and for the reasons that its franchise tax should be computed under Subdivision (b) of Article 7084 of the Revised Civil Statutes of Texas of 1925, whereas the demand was based upon a computation under Subdivision (d) of said Article and that if the taxes should be computed under Subdivision (b), the amount of the tax would be less than that demanded by the Secretary of State to the extent of the said $132.50 paid under protest."

 Art. 7057b, Sec. 1, provides for a protest "setting out fully and in detail each and every ground or reason why it is contended that such demand is unlawful or unauthorized." Sec. 2 confines the issues in a suit to recover the tax to "only those arising out of the grounds or reasons set forth in such written protest as originally filed." We think it too clear for argument or elaboration that the 'ground or reason set forth in the protests was that protestants were subject to Sec. B and not to Sec. D. They were railroad corporations and were therefore in the first class mentioned in Sec. B.

The trial court's judgment is affirmed.

Affirmed.